**Darlene S. CRUSE, Plaintiff,**

v.

**G & J USA PUBLISHING, Defendant.**

**No. 99 Civ. 2905(SAS).**

United States District Court, S.D. New York.

May 8, 2000.

Nicholas A. Penkovsky, Law Offices of Nicholas A. Penkovsky of counsel, Charles M. Powell, Jr. & Associates, New York City; for Plaintiff.

Guy T. Petrillo, Gerald S. Hartman, John E. Menditto, Swidler Berlin Shereff Friedman, LLP, Washington, DC, for Defendant.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

Plaintiff Darlene Cruse, a former Administrative Assistant with defendant Gruner & Jahr USA Publishing [1] ("G & J"), is suing G & J under 42 U.S.C. § 1981 and Article 15 of the New York State Human Rights Law, claiming racial discrimination in connection with the terms and conditions of her employment. Specifically, Cruse alleges that G & J terminated her employment because she is black. Cruse further alleges that she was paid less than she should have been paid because of her race and was retaliated against when she complained about her compensation. Defendant now moves for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). For the following reasons, defendant's motion is granted and this case is dismissed.

## I. Facts

G & J publishes seven major national magazines including Parents, Family Circle, McCall's and Child. See Declaration of Yvette Miller, general counsel to G & J, in Support of Defendant's Motion for Summary Judgment, dated December 15, 1999 ("Miller Decl.") ¶ 1. In April of 1995, Cruse was hired by G & J as an Administrative Assistant in its Consumer Products Department. See Plaintiff's Affidavit in Opposition to Defendant's Motion for Summary Judgment, dated February 17, 2000 ("Cruse Aff.") ¶ 4. During her time at G & J, Cruse was the only black employee in her department. Id. ¶ 36.

Initially, Cruse assisted Lisa Cooperstein, Director of Consumer Products, and Lainie Bertsche, Director of Business Development. Id. ¶ 4. Ms. Bertsche then left G & J's employ and Ms. Cooperstein assumed some of her duties. See Deposition of Darlene Cruse, dated October 20, 1999 ("Cruse Dep.") at 28–29, attached as Exhibit A to the Declaration of John E. Menditto, defendant's attorney, dated December 16, 1999. Some time after Ms. Bertsch left, Ms. Cooperstein called a department meeting with Karen Dragotto, Book Publishing Manager, Heidi Kurlander, Licensing Manager, and Cruse. Cruse Aff. ¶ 6. As a result of this meeting, Ms. Cooperstein issued a memorandum, dated November 15, 1995, setting forth the responsibilities associated with the following job titles: Book Publishing Manager, Licensing Manager and Administrative Assistant.[2] Id.

● Provides administrative support to books and licensing area
● Handles all administrative duties including: phones, mail, meeting schedules, daily inqui-

---

1. Sued incorrectly herein as G & J Publishing.

2. The following responsibilities were included in the Administrative Assistant job title:

On May 21, 1996, Cruse received her annual job performance evaluation from Ms. Cooperstein. *Id.* ¶ 8 and Ex. 2. On that form, Cruse's overall performance was graded between the "Meets Expectations" and "Exceeds Expectations" categories.[3] *Id.* In the commentary, Ms. Cooperstein wrote: "Depending on the day and project Darlene can really take the ball & run or require some coaxing to boost her manyana attitude. Usually shows great enthusiasm when she is 'into' a project." *Id.* Ex. 2.

Ms. Cooperstein left defendant's employ near the end of 1996. *Id.* ¶ 9. For approximately three months thereafter, Cruse assisted Ms. Kurlander and Ms. Dragotto, although she claims that neither of them actually supervised her. *Id.* Ms. Dragotto resigned from G & J in March 1997. *Id.* ¶ 10. As a result, from April through December 1997, Cruse assisted only Ms. Kurlander but "reported" to Doug McKay[4] when she needed help with day-to-day matters in the department. Cruse Dep. at 105–06. Although Cruse continued to perform her administrative duties as before, she began to take on some of the managerial duties previously performed by Ms. Dragotto without any additional training. Cruse Aff. ¶¶ 11–13. These duties, which exceeded those of an Administrative Assistant, included the responsibilities of a Book Publishing Manager. *Id.* ¶ 7. In the absence of any direct supervision, Cruse maintained close contact with Mr. McKay and reported her activities to him. *Id.* ¶ 13.

In June of 1997, Cruse was asked to write a self-evaluation of her job performance which she did. Cruse Aff. ¶ 15 and Ex. 4. In that evaluation, Cruse stated:

> I am a *key* player in the Books and Licensing department and I believe my title should reflect my contribution to G & J. I welcome the chance to discuss a promotion to Coordinator of Books & Licensing with compensation reflecting my additional responsibilities.

*Id.* Ex. 4 (emphasis in original). On June 2, 1997, Cruse met with John Heins, President of G & J, who approved a raise of approximately 4% and made the following notes to the file:

> No justification for giving more than standard raise. Has had to deal with change in department, but feedback is that [she] hasn't shown great initiative to fill out her days given that two of her bosses are gone and internal work and development has been limited. *Otherwise, no reason to believe she hasn't continued to do her job.*

*Id.* Ex. 5 (emphasis added). More glowing praise came from Mr. McKay who wrote an e-mail on November 5, 1997 stating: "Thanks. You do great work." *Id.* ¶ 18 and Ex. 6. This comment was in response

---

ries, customer requests, customer service, internal requests for books and related products
• Organizes media kits, sales support material, presentation pieces to support sales efforts
• Executes department mass mailings to generate special sales in non-traditional outlets
• Provides financial assistance on spreadsheets/p & l statements, track royalty payments
• Assists book manager with international licensing requests, tracking photography & edit
• Manages expenses related to freelancers working on books and licensing projects
• Maintains library of related trade journals, books and back issues of magazines
• Codes all incoming expenses according to procedures for books and licensing
• Supports editorial work with date input and some writing

Cruse Aff.Ex. 1

**3.** The "Meets Expectations" category is described as "Meets job requirements and achieves major results expected" while the "Exceeds Expectations" category is described at "Exceeds full requirements of the position; meets full position responsibilities and in most instances exceeds them." *Id.* Ex. 2.

**4.** Doug McKay, Director of G & J Custom Publication, supervised the Consumer Products Department on an interim basis during this nine-month period. Declaration of Tammy Palazzo, Director of the Books & Licensing Department (formerly known as the Consumer Products Department), dated December 15, 1999 ("Palazzo Decl.") ¶ 3.

to a report prepared by Cruse for Mr. McKay concerning the status of royalties, compliance issues, and questions concerning book contracts. *Id.* ¶ 18.

Unfortunately, such praise did not continue when Tammy Palazzo joined G & J on January 12, 1998. Palazzo Decl. ¶ 2. Although Ms. Palazzo acknowledged that Cruse was responsible for "providing administrative support to the department, including general administrative tasks as well as supporting product development and sales efforts," she found Cruse "unable to efficiently and effectively perform the functions of her position."[5] *Id.* ¶ 3, 6. After only three weeks on the job, Ms. Palazzo prepared a memorandum, incorrectly dated February 5, 1997, detailing the specific problems she had with Cruse's performance. *Id.* ¶ 7 and Ex. A. Ms. Palazzo identified five problem areas: (1) the status of G & J's deal with Random House Value Publishing for the Christmas Treasury; (2) pricing for the Chain Sales account; (3) royalty payments to Murdoch; (4) coding of expenses to ledger accounts; and (5) compiling status information on each and every active project. *Id.* Ex. A.

On February 17, 1998, Ms. Palazzo met with Ms. Kurlander, Mr. McKay and Miles Merwin, G & J's Manager of Staffing and Employee Relations, to discuss her concerns. Mr. Merwin recalls that the following problems were raised at this meeting: (1) lack of understanding of the functions associated with being an Administrative Assistant in the Books & Licensing Department; (2) numerous and costly errors regarding book contracts; (3) excessive time spent on personal calls; and (4) lack of skills necessary to advance to the next level at G & J. Declaration of Miles Merwin in Support of Defendant's Motion for Summary Judgment, dated December 15, 1999, ("Merwin Decl.") ¶ 3. Cruse was not invited to this meeting. Cruse Aff. ¶ 26.

Mr. Merwin instructed the managers to meet with Cruse and review with her the broad performance issues that had been raised. Merwin Decl. ¶ 4. Cruse was also to be placed on a "thirty-day warning" period which, according to Mr. Merwin,

is the policy and practice of G & J to place employees on a "thirty-day warning" period where their unsatisfactory performance requires immediate improvement. This policy and practice is implemented regardless of the race of the employee who is performing unsatisfactorily. Where an employee's performance does not immediately improve, the employee is terminated.

*Id.* ¶ 5.

On February 25, 1998, Ms. Palazzo, Ms. Kurlander and Mr. McKay met with Cruse to put her on a thirty-day warning period. Palazzo Decl. ¶ 12. After this meeting, Ms. Palazzo gave Cruse a memorandum which memorialized the performance problems identified during the meeting. *Id.* This memorandum stated that weekly meetings would be held to discuss Cruse's performance in relationship to the following:

- overall contributions to the Books and Licensing Department
- responsibility for your work (e.g. ownership over your particular assignments and providing clear follow-up on projects without prompting)
- *strategic planning*
- *initiative* (e.g. proactively updating reports, etc.)
- *project management*
- working independently, identifying problems and appropriately seeking advice
- *new business development*
- cutting down on personal phone calls.

*Id.* Ex. B (emphasis added). During the first three weeks of Cruse's thirty-day

---

5. Ms. Palazzo states that Ms. Kurlander informed her that Cruse was "in over her head." *Id.* ¶ 4. Without a supporting affidavit from Ms. Kurlander, which is curiously missing from defendant's motion papers, this statement is hearsay. This is of no import, however, as Ms. Palazzo decided to evaluate Cruse's performance independently. *Id.* ¶ 5.

warning period, Ms. Palazzo claims to have met with her and Mr. McKay at least twice. *Id.* ¶ 13. However, according to Cruse, on March 12, 1998, only fifteen days after being placed on the thirty-day warning, she met with Ms. Palazzo, Mr. Merwin and Ms. Kurlander who concluded that Cruse was unable to improve her performance to the required level. *Id.* The level of hostility was so high at this meeting that Cruse agreed to cease working in the Books & Licensing Department. Cruse Aff. ¶ 31. Cruse was told that her position would end on April 17, 1998 unless she found another position within G & J. Merwin Decl.Ex. B. Although Cruse went on two interviews within G & J, she could not secure another position and was consequently fired on April 17, 1998. Cruse Dep. at 137–42.

## II. Discussion

### A. Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *accord Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The burden of showing that no genuine factual dispute exists rests on the moving party. *See Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). In assessing the record to determine whether a genuine issue of material fact exists, courts must resolve all ambiguities and draw all reasonable inferences in favor of the non-moving party. *See Nora Beverages, Inc.*

*v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998).

Once the moving party has met its initial burden of production, the non-moving party must come forward with specific facts evidencing a genuine issue for trial. *See Matsushita Elec. Indus. Co., Ltd., v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The non-moving party "must produce specific facts indicating that a genuine issue of fact exists. If the evidence [presented by the non-moving party] is merely colorable, or not significantly probative, summary judgment may be granted." *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998) (internal quotation marks and citations omitted, alteration in original).

Greater caution must be exercised in granting summary judgment in employment discrimination cases where the employer's intent is genuinely in issue. *See Belfi v. Prendergast,* 191 F.3d 129, 135 (2d Cir.1999) (citations omitted). This is so because "[e]mployers are rarely so cooperative as to include a notation in the personnel file that the firing is for a reason expressly forbidden by law." *Bickerstaff v. Vassar College,* 196 F.3d 435, 448 (2d Cir.1999) (internal quotation marks and citation omitted, brackets in original). However, even where an employer's intent is at issue, "a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment." *Schwapp* 118 F.3d at 110; *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985).

### B. Plaintiff's Unequal Pay Claim

Because plaintiff has not offered any direct evidence of discrimination,[6] her claim of racially discriminatory disparity in pay, as well as her termination claim, must

---

6. Direct evidence of discriminatory behavior includes policy documents and evidence of statements and other action by decision makers that reflect a discriminatory attitude. *See Raskin v. Wyatt Co.,* 125 F.3d 55, 60 (2d Cir.1997). "Because an employer who discriminates is unlikely to leave a 'smoking gun'

attesting to discriminatory intent, a victim of discrimination is seldom able to prove [her] claim by direct evidence, and is usually constrained to rely on circumstantial evidence." *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 37 (2d Cir.1994) (citation omitted).

proceed under the three-step burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506–08, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). *See McLee v. Chrysler Corp.*, 109 F.3d 130, 134 (2d Cir.1997) (Section 1981 and Title VII employ same burden shifting analysis); *Leopold v. Baccarat, Inc.*, 174 F.3d 261, 264 n. 1 (2d Cir.1999) (same as to New York State Human Rights Law).

Plaintiff's pay disparity claim under either § 1981 or the New York State Human Rights Law is arguably time-barred under the three-year statute of limitations applicable to both statutes. *See Tadros v. Coleman*, 898 F.2d 10, 12 (2d Cir.1990) (§ 1981 claim is subject to New York's three-year limitations period applicable to personal injury actions); *Murphy v. American Home Prod. Corp.*, 58 N.Y.2d 293, 461 N.Y.S.2d 232, 239, 448 N.E.2d 86 (1983) (three-year period applicable to claims under New York Human Rights Law). The only instance of any alleged pay disparity occurred in 1995, *see infra*, yet plaintiff did not file her complaint until 1999.[7] Resolving all ambiguities in Cruse's favor, as required, I will treat her one allegation of pay disparity as a continuing violation and conclude that her claim is not time-barred. *See Kim v. Dial Service Intern., Inc.*, 96 Civ. 3327, 1997 WL 5902 at 5 (S.D.N.Y. Jan.8, 1997) ("Courts will extend the statute of limitations where plaintiff can show the discriminatory conduct amounts to a 'continuing violation.' "); *Brodrick v. City of New York*, 942 F.Supp. 196, 199 (S.D.N.Y.1996) (an allegation that an employee is paid less than others similarly situated is sufficient to satisfy the continuing violation doctrine).

To establish a prima facie pay discrimination claim, Cruse must show: (1) that she is a member of a protected class; (2) that she was paid less than similarly situated non-members of her protected class; and (3) evidence of discriminatory animus. *See Belfi*, 191 F.3d at 139 (setting forth prima facie elements for Title VII pay discrimination claim). Here, Cruse has failed to set forth a prima facie case of pay discrimination for two reasons: (1) she can point to no similarly situated Caucasian employee who was paid more than she; and (2) she has offered no evidence of discriminatory animus.

In support of her pay discrimination claim, Cruse compares herself to Gigi Berman, a Parents magazine editor, who provided editorial and research assistance to the author of the book "It Worked For Me." Miller Decl. ¶ 2. These editorial and research services were outside the scope of Ms. Berman's general duties as a G & J employee and, accordingly, she was paid $2,000 in extra compensation. During her deposition, Cruse stated that she took over Ms. Berman's research duties some time in 1995 but was not paid any extra compensation. Cruse Dep. at 90. Ms. Berman, however, is not similarly situated to Cruse as she is a professional editor while Cruse was an Administrative Assistant with no experience as an editor. Even if Ms. Berman is somehow similarly situated to Cruse, there is no evidence that she was paid more than Cruse because of her race. This is apparent from the following testimony:

Q: What evidence do you have that you were not paid the same as Gigi Berman because of your race?

A: Well, they offered her a lot more money to do the same work I was doing for her, I mean, for the department. And I got paid on a much, much, much lower scale than she did.

Q: Is that your only evidence that you were treated in a racially discrimina-

**7.** Cruse's Complaint alleges that "she has been treated in a disparate fashion from similarly situated white employees in that, as of December 1996, plaintiff performed duties beyond that of an Administrative Assistant without receiving the appropriate compensation for such work." Complaint ¶ 9.

tory way, the fact that you got paid differently from Gigi Berman?

A: In that particular case.

Cruse Dep. at 92. Thus, Cruse's pay discrimination claim fails as a matter of law and must be dismissed.

## C. Plaintiff's Retaliation Claim

Section 296 of the New York Human Rights Law prohibits retaliatory discharges. Specifically, this statute provides, in pertinent part, as follows:

It shall be an unlawful discriminatory practice ... [f]or any employer ... to discharge, expel or otherwise discriminate against any person because he has opposed any practices forbidden under this article or because he has filed a complaint, testified or assisted in any proceeding under this article.

N.Y. Executive Law § 296(1)(e) (McKinney 1999). Section 1981 also prohibits retaliatory discharges but only if the retaliation is "in response to the claimant's assertion of rights that were protected by Section 1981." *Hawkins v. 1115 Legal Serv. Care,* 163 F.3d 684, 693 (2d Cir. 1998). Here, Cruse alleges that the thirty-day warning in February of 1998 and her subsequent termination were in retaliation for the remarks she made in her June 1997 self-evaluation concerning her level of compensation and duties. This claim is fatally flawed.

 To make out a prima facie case of retaliation, Cruse must prove that: (1) she was engaged in protected activity; (2) her employer was aware of that activity; (3) she suffered an adverse employment action; and (4) there was a causal link between the protected activity and the adverse employment action. *See Reed v. A.W. Lawrence and Co., Inc.,* 95 F.3d 1170, 1178 (2d Cir.1996) (citing *Manoharan v. Columbia Univ. College of Physicians & Surgeons,* 842 F.2d 590, 593 (2d Cir.1988)). Cruse cannot establish that she engaged in any statutorily protected activity because she conceded in her deposition that she never complained to anyone

at G & J that she believed she was a victim of race discrimination. Cruse Dep. at 142–43. Even if Cruse's complaint about her salary could somehow be construed as statutorily protected, she has failed to proffer any evidence that the decision to terminate her was causally linked to this complaint. Cruse Dep. at 120–21. Moreover, the passage of more than six months from the date Cruse complained about her level of compensation to the date of the warning refutes any causal link. *Cf. Manoharan,* 842 F.2d at 593 ("Proof of the causal connection can be established indirectly by showing that the protected activity was closely followed in time by the adverse action."). Accordingly, plaintiff's retaliation claim must also be dismissed.

## D. Plaintiff's Termination Claim

### 1. Legal Standard for Discriminatory Termination

Under the *McDonnell Douglas* framework applicable to plaintiff's § 1981 and New York Human Rights Law claims, *see infra,* a plaintiff must first prove a prima facie case of discrimination. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. If the plaintiff meets this burden, the employer must produce evidence "that the adverse employment actions were taken 'for a legitimate, nondiscriminatory reason.'" *Hicks,* 509 U.S. at 506–07, 113 S.Ct. 2742 (quoting *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)); *Fisher v. Vassar College,* 114 F.3d 1332, 1335 (2d Cir.1997). If the defendant produces such evidence, "the presumption raised by the prima facie case is rebutted, and drops from the case." *Hicks,* 509 U.S. at 507, 113 S.Ct. 2742. Plaintiff retains the ultimate burden of proving that the defendant's reason was merely a pretext for discrimination. *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. 1817. *See also Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 567 (2d Cir.2000).

### 2. Plaintiff's Prima Facie Case

In order to make out a prima facie case of discriminatory discharge, a plaintiff must establish that: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) the adverse employment action took place under circumstances that give rise to an inference of unlawful discrimination. *See Stern v. Trustees of Columbia University*, 131 F.3d 305, 311–12 (2d Cir.1997) (citing *Burdine*, 450 U.S. at 253 & n. 6, 101 S.Ct. 1089). The burden of proof that a plaintiff must meet at the prima facie stage in order to survive summary judgment is de minimis. *See Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1115 (2d Cir.1988). Nonetheless, a plaintiff must proffer some admissible evidence of circumstances that would be sufficient to permit an inference of discriminatory motive.[8] *See Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 204 (2d Cir. 1995).

Applying this standard, Cruse has made out a prima facie case. As a black woman who was terminated from a position that she held for over two and one-half years, Cruse has clearly satisfied the first three elements. As to the fourth element,

> a plaintiff may make out a prima facie case of discrimination in a discharge case by credible evidence that she continued to possess the objective qualifications she held when she was hired, or by her own testimony that her work was satisfactory, even when disputed by her employer, or by evidence that she had held her position for a significant period of time.

*MacDonald v. Eastern Wyoming Mental Health Ctr.*, 941 F.2d 1115, 1121 (10th Cir.1991) (internal citations omitted).

Cruse has offered some evidence that her performance as an Administrative Assistant was satisfactory. As to her work performance, Cruse has stated that "the record shows that [she] did a credible job as both an Administrative Assistant and in performing managerial duties." Cruse Aff. ¶ 36. Cruse also has several sources that independently corroborate her satisfactory performance: (1) the May 1996 evaluation by Ms. Cooperstein grading Cruse's overall performance somewhere between meets and exceeds expectations; (2) the June 1997 review by Mr. Heins, albeit lukewarm, where he states that there is no reason to believe Cruse hasn't continued to do her job; (3) the November 1997 e-mail response from McKay telling Cruse that she does great work. In addition, the fact that she worked at G & J for over two and one-half years without any complaints further establishes her prima facie case. Cruse Aff. ¶ 27 ("February 25, 1998 was the first time any supervisor or manager told me that there was any need for improvement in my job performance.").

### 3. Defendant's Proffered Non–Discriminatory Reason and Plaintiff's Showing of Pretext

Defendant has presented a legitimate, nondiscriminatory reason for plaintiff's termination, namely, unsatisfactory performance. At this stage of the *McDonnell Douglas* analysis, "plaintiff's opportunity to demonstrate that the employer's proffered reason was false merges with her ultimate burden to persuade the trier of fact that she has been the victim of intentional discrimination (i.e., that an illegal discriminatory reason played a motivating role in the adverse employment decision)." *Bickerstaff*, 196 F.3d at 446–47 (citations omitted). Thus, a plaintiff may defeat summary judgment "either directly

---

**8.** In this regard, courts "must carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture ... After all, '[a]n inference is not a suspicion or a guess. It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact [that is known to exist].'" *Bickerstaff*, 196 F.3d at 448 (quoting 1 Leonard B. Sand, *et al.*, Modern Federal Jury Instructions ¶ 6.01, instr. 6–1 (1997)).

by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine,* 450 U.S. at 256, 101 S.Ct. 1089. To establish pretext and thereby successfully oppose summary judgment, a plaintiff may demonstrate weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nondiscriminatory reason for its action. *See Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1323 (10th Cir.1997). A plaintiff may also rely upon the same evidence used to support her prima facie case to show pretext. *See Kerzer v. Kingly Mfg.,* 156 F.3d 396, 402 (2d Cir.1998).

Cruse has neither rebutted defendant's legitimate, nondiscriminatory reason for discharge as pretextual nor has she offered any evidence that racial discrimination played any role in her termination. In fact, the only support Cruse offered for her termination claim is the following speculative testimony:

Q: What evidence do you have that you were terminated because of your race?

A: Well, I wasn't allowed really to have any kind of opportunity for growth. I mean, I wasn't given a chance. I mean, I felt that I wasn't given the chance to really perform to my fullest potential.

Q: How did that relate to your race?

A: Because a lot of other people that I thought of did. I mean, they would send around like a memo saying that this one got promoted, she is going to be doing this, doing that. I never had the opportunity to do that.

\* \* \* \* \* \*

Q: What is the discriminatory conduct that you are referring to in paragraph 11 [of the complaint]?

A: I felt under the circumstances that me having a 30–day warning, I mean, I felt that I was deprived ...

\* \* \* \* \* \*

Q: What is the basis on which you were claiming that you were discharged because of your race?

A: I just felt under those circumstances that would not have happened. I really felt that that would not have happened to somebody else. I'm sorry, that that would not have happened to somebody white. I think they would have been given more warning. I got none. My warning was out the door.

Cruse Dep. at 92–93, 120, 121–22. Such speculation does not create a genuine issue of material fact as to the reason for Cruse's termination. *See D'Amico v. City of New York,* 132 F.3d 145, 149 (2d Cir.), *cert. denied,* 524 U.S. 911, 118 S.Ct. 2075, 141 L.Ed.2d 151 (1998).

Cruse's attempt to show pretext is also unavailing. Although Cruse was never formally assigned a different job or asked to expand her duties, she did assume some of the managerial responsibilities formerly performed by Ms. Dragotto on her own accord. Accordingly, Ms. Palazzo evaluated her based, in part, on these expanded duties. Thus, Ms. Palazzo's negative evaluation of Cruse is not inconsistent with Cruse's prior positive evaluations and is not indicative of pretext. *See Orisek v. American Institute of Aeronautics and Astronautics,* 938 F.Supp. 185, 191 (S.D.N.Y.1996), *aff'd,* 162 F.3d 1148 (2d Cir.1998), *cert. denied,* 526 U.S. 1065, 119 S.Ct. 1456, 143 L.Ed.2d 542 (1999) (pretext not found where employee's job description remained the same but her duties expanded and a different approach was required); *Healy v. New York Life Ins. Co.,* 860 F.2d 1209, 1215 (3d Cir.1988) (good performance evaluation in lower level position does not imply success in a more demanding job).

Even if it were inconsistent, however, this does not support a finding of pretext. "[A] new manager is allowed to appraise an employee's work according to his or her own expectations, even if those

expectations are contrary to a prior manager's expectations." *Beers v. NYNEX Material Enterprises Co.*, 88 Civ. 305, 1992 WL 8299, at \*11 (S.D.N.Y. Jan.13, 1992) (citation omitted). *See also Viola v. Philips Medical Sys., of North Am.*, 42 F.3d 712, 717–18 (2d Cir.1994) (a change in management's evaluation of an employee's performance does not by itself raise an inference of pretext); *Brown v. Time, Inc.*, 95 Civ. 10081, 1997 WL 231143 at 12 (S.D.N.Y. May 7, 1997) ("[S]uch an inference is even less permissible when a new supervisor is appointed, who is entitled to set [her] own standards and agenda."). Accordingly, Cruse's criticisms of Ms. Palazzo's evaluation of her do not support a finding of pretext.[9]

Nor has Cruse offered sufficient evidence that a similarly situated Caucasian employee was treated differently from her.[10] In her affidavit in opposition, Cruse describes another employee of G & J, a Caucasian woman and former Administrative Assistant, who was employed at the same time as Cruse. Cruse Aff. ¶ 22. This employee was also allegedly given a thirty-day warning but, unlike Cruse, remained employed for approximately eighteen months thereafter, without any change in her warning status, and finally left on her own terms. *Id.* In addition, this employee did not have weekly meetings or evaluations like those imposed on Cruse. *Id.*

Glaringly absent is crucial information regarding this comparator such as the circumstances surrounding the issuance of the thirty-day warning and her eventual departure. While the comparison case need not be a perfect replica, *see Conward v. Cambridge Sch. Comm.*, 171 F.3d 12, 20 (1st Cir.1999), reasonableness is the touchstone. "The test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated." *Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 19 (1st Cir.1989). Here, plaintiff has failed to proffer sufficient information to permit the Court to evaluate the relevance of this comparison. "In order for employees to be 'similarly situated' for purposes of establishing a plaintiff's prima facie case, they 'must have been subject to the same standards governing performance evaluation and discipline, and must have engaged in conduct similar to the plaintiff's.' " *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 96 (2d Cir.1999) (quoting *Mazzella v. RCA Global Communications, Inc.*, 642 F.Supp. 1531, 1547 (S.D.N.Y.1986), *aff'd*, 814 F.2d 653 (2d Cir.1987)). Most importantly, for other employees to be considered similarly situated, they must have reported to the same supervisor as plaintiff. *See Mazzella*, 642 F.Supp. at 1547. Because this vital information is lacking, this unidentified white employee cannot be considered similarly situated to Cruse and is therefore irrelevant.[11]

**9.** Nor does Cruse's disagreement with Ms. Palazzo's perceptions of her work satisfy her burden of showing the defendant's proffered reason was a pretext for discrimination. *See McLee v. Chrysler Corp.*, 109 F.3d 130, 135 (2d Cir.1997) (plaintiff's rationalizations of his performance deficiencies did not raise material fact regarding employer's explanation that he was fired for unsatisfactory performance): *see also Reilly v. Metro–North Commuter R. Co.*, 93 Civ. 7317, 1996 WL 665620 at 9 (S.D.N.Y. Nov. 15, 1996) ("An employee's opinion that a performance review was unfair supported by only her own conclusory statements to that effect, cannot bootstrap her claims into a Title VII claim of discrimination.").

**10.** One way a plaintiff may prove pretextual discharge is to demonstrate that similarly situated employees were treated differently than she was. *See Francis v. Runyon*, 928 F.Supp. 195, 202 (E.D.N.Y.1996) (citing *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. 1817).

**11.** Plaintiff could have sought additional discovery in order to oppose this motion under Federal Rule of Civil Procedure 56(f). *See Rodriguez–Cuervos v. Wal–Mart Stores, Inc.*, 181 F.3d 15, 23 (1st Cir.1999) ("In order to 'savor the balm' of Rule 56(f), a party must move for a discovery continuance in a timely fashion.") (citation omitted). Because she failed to seek a continuance, discovery, which

Even if Cruse could show pretext, however, she cannot survive summary judgment as the record is devoid of any direct or circumstantial evidence of intentional racial discrimination on defendant's part. As recently explained by the Second Circuit:

> An employer's assertion of false reasons does not eliminate the requirement that the evidence, considered in its entirety, including any inference reasonably drawn from the falsity of the proffered reasons, must be capable of supporting a reasonable finding that the true reason was the prohibited discrimination plaintiff alleges.

*McCarthy v. New York City Technical College of City Univ. of New York*, 202 F.3d 161, 166 (2d Cir.2000). The court cited its earlier decision in *Fisher*, 114 F.3d at 1344–45, where it ruled that "plaintiff's satisfaction of the diminished prima facie test of *McDonnell Douglas*, coupled with a showing that the employer's proffered explanation is false, does not necessarily add up to sufficient evidence to sustain a verdict in plaintiff's favor." *Id.* at 167. This logic is equally applicable to the summary judgment context as there is "no special rule for testing sufficiency of evidence in a discrimination case." *Id.* Accordingly, because Cruse has offered no evidence that G & J acted with discriminatory animus, this claim is dismissed.[12]

### III. Conclusion

For the foregoing reasons, defendant's motion for summary judgment is granted

and this case is dismissed. The Clerk of the Court is directed to close this case.

SO ORDERED.

**12.** This is not to say that defendant's decision to summarily discharge Cruse was not unfair or arbitrary but it did not stem from a protected characteristic, here, race. *See Visco v. Community Health Plan*, 957 F.Supp. 381, 388 (N.D.N.Y.1997) ("[A]n employer may exercise business judgment in making personnel decisions as long as they are not discriminatory.") (citing *Dister*, 859 F.2d at 1116 ("Evi-

dence that an employer made a poor business judgment in discharging an employee generally is insufficient to establish a genuine issue of fact as to the credibility of the employer's reasons.")). As such, this Court will not sit as a super personnel department, evaluating the merits of G & J's nondiscriminatory business decision to terminate Cruse. *See Mesnick v. General Elec. Co.*, 950 F.2d 816, 825 (1st Cir.1991).